# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| BADGER HOLDING LLC and S&E BRIDGE & SCAFFOLD LLC, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) C.A. No. 2017-0147-SG ) ) |
| EDMUND KIRSCH, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Date Submitted: June 13, 2018
Date Decided: October 1, 2018

Thomas E. Hanson, Jr., of BARNES & THORNBURG LLP, Wilmington, Delaware, *Attorney for Plaintiffs*.

Ronald L. Daugherty, of SALMON, RICCHEZZA, SINGER & TURCHI, LLP, Wilmington, Delaware, *Attorney for Defendant*.

GLASSCOCK, Vice Chancellor

This matter is before me primarily to enforce a covenant not to compete. The Defendant is Edmund Kirsch, an experienced participant in the scaffolding industry. In 2012, he went to work for S&E Bridge and Scaffold, LLC ("S&E") as Director of Sales. At that time, he entered an employment agreement and a stock award agreement, both of which contained essentially identical (and typical) covenants not to compete. Kirsch was, however, unwilling to categorically forgo competitive opportunities in the future. Consequently, he specifically negotiated a provision in the employment agreement under which, at his voluntary termination of employment with S&E, the company could elect to continue to pay his salary and benefits for one year, as "severance pay." If they failed to do so, he would be free of the contractual covenants not to compete post-employment.

In 2016, Kirsch began to consider leaving S&E to work for a competitor. In October of that year, he signed an employment agreement with another scaffolding entity, although his employment with the entity did not begin until the following February. On January 3, 2017, Kirsch gave notice to S&E that he would terminate his employment as of January 31. S&E declined to pay him the contractual severance payment.

While still at S&E in January 2017, Kirsch solicited at least one S&E customer to give its business to his new employer. S&E was unaware of this

activity both when it declined to make the severance payments, and as of the time Kirsch left the company on January 31, 2017.

The Plaintiffs seek to enjoin Kirsch from competing with S&E post-employment, for the contractual period of two years. Kirsch contends that he has no post-employment non-compete obligations, because S&E elected not to trigger such by failing to pay the severance that is a contractual precedent. The matter is before me on cross-Motions for Summary Judgement. The Plaintiffs argue that they are entitled to enforce the non-compete, regardless of severance. Primarily, they argue that the severance provision in the employment agreement, and the other obligations therein, terminated after four years by its own terms. They seek to enforce the stock award agreement, which does not so terminate. I find, however, that the parties treated the employment agreement as continuing, and that in any event, the stock award agreement specifically incorporates the severance provision, so that S&E's obligation to elect between severance and a release of the non-compete survived as of January 2017.

The Plaintiffs also point out that Kirsch breached the non-compete prior to the time of termination, a fact of which they were unaware until after his employment had ended and they had chosen not to pay him severance. Notably, Kirsch was not fired for cause. Under the facts here, and the language of the contract, enforcement of the *post-employment* non-compete obligation required

2

S&E to pay severance. Having decided not to make the trigger payments, S&E cannot enforce the post-employment non-compete.

I have found that Kirsch was free to compete after January 31, 2017. He began doing so earlier, however, and in January he solicited business in competition with S&E. Regardless of the fact that S&E cannot enjoin Kirsch's competition after January 31, 2017, the Plaintiffs are entitled to damages, if any, for breach of Kirsch's obligations not to compete before that time. The determination of damages awaits a developed record. My reasoning follows.

## I. BACKGROUND

*A. The Parties and Relevant Non-Parties*

Plaintiff Badger Holdings, LLC ("Badger") is a Delaware limited liability company with a principal place of business in Waukesha, Wisconsin.[1] Badger is a holding company that owns, among other entities, Plaintiff S&E Bridge & Scaffold, LLC.[2]

Plaintiff S&E Bridge & Scaffold, LLC ("S&E") is a New York limited liability company with a principal place of business in Carlstadt, New Jersey.[3] S&E

---

[1] Compl. ¶ 9. Badger changed its name from OIP Holdings LLC ("OIP") in 2012. Aff. of Curtis Paulsen, Jan. 26, 2018 [hereinafter "Paulsen Aff."] ¶ 4. OIP was previously known as Safway Holdings LLC. Aff. of Thomas E. Hanson, Jan. 12, 2018 [hereinafter "Hanson Aff."], Ex. 5, Phantom Class A Unit Plan.
[2] Paulsen Aff. ¶ 6.
[3] Compl. ¶ 10.

3

is a premier provider of scaffolding, sidewalk bridges, and hoists for large, complex construction projects in New York, New Jersey, and Pennsylvania.[4]

Defendant Edmund Kirsch is resident of Valley Cottage, New York, and a former Director of Sales at S&E.[5] Kirsch left S&E to work for non-party DHS Fraco, LLC ("DHS Fraco") in early 2017, at which time the Plaintiffs filed this suit.[6]

*B. Relevant Facts*

1. <u>Kirsch Joins S&E</u>

Kirsch joined S&E on January 20, 2012.[7] At that time, he was an experienced professional in the scaffolding industry, having previously worked as the President of one scaffolding company and as the Sales Manager of another.[8] Because of his experience in the field, Kirsch was unwilling to enter into a non-compete agreement with S&E that would categorically bar him from subsequently working at other, similar companies.[9] As such, Kirsch specifically negotiated his Employment Agreement with Michael Breslin, the President of S&E.[10]

The Employment Agreement contains a non-compete provision:

---

[4] Compl. ¶¶ 2–3.
[5] Compl. ¶¶ 3, 15.
[6] Compl. ¶ 7.
[7] Opening Br. in Support of Def. Mot. for Summ. J., Ex. A, Emp't Agreement. Kirsch had previously worked for Perimeter Bridge & Scaffold Co., Inc., which was acquired by S&E in January 2012. Aff. of Colm Coen, Jan. 26, 2018 [hereinafter "Coen Aff."] ¶ 4.
[8] *See* Hanson Aff. Ex. 1, Kirsch Dep. at 9:16–19, 12:25–13:3.
[9] *See id.* at 17:7–17.
[10] Opening Br. in Support of Def. Mot. for Summ. J., Ex. C, Kirsch Dep. at 18:14–20.

Kirsch shall (a) at all times during his employment, and for five (5) years after the termination of [his] employment . . . hold in strictest confidence any and all proprietary and confidential information . . . provided, that this restriction will not apply with respect to any such data or information after such data or information . . . becomes public knowledge or generally publicly known in the industry through no breach by [Kirsch]; (b) not during [his] employment and for a period of two (2) years thereafter, without the prior written consent of [S&E], either directly or indirectly, operate or perform any advisory or consulting services for, invest in . . . or otherwise operate or become associated in any capacity (including as an employee) with, any company, corporation, partnership, organization, proprietorship, or other entity which develops, manufactures, sells or distributes products or services in competition with [S&E] as conducted during [Kirsch's] employment . . . . and (d) not at any time during [Kirsch's] employment, and for a period of two (2) years thereafter, without the prior written consent of [S&E], contact, solicit, or entice any customer of [S&E] or any of [S&E] Affiliates as of the Effective Date or at any time during the two (2) years immediately preceding the Effective Date, or any prospective customer to which [S&E] made a project bid or proposal during such period, so as to cause such customer or prospective customer to cease or reduce its business with [S&E] or any of [S&E] Affiliates.[11]

The contract also contemplated severance payments from S&E to Kirsch at the time of his leaving the company. Although the non-competition and non-solicitation provisions in Section 3.1(b) and (d) prohibited Kirsch from competing with S&E, under Section 5.3(c), they would be enforceable after Kirsch left the company only

---

[11] Opening Br. in Support of Def. Mot. for Summ. J., Ex. A, Emp't Agreement § 3.1(a), (b), (d).

if S&E elected to pay Kirsch severance payments.[12]  If S&E did not pay Kirsch severance, Kirsch would be free to compete.

The Employment Agreement is governed by New York law.[13]  It contains an irreparable harm provision: in signing it, Kirsch acknowledged that "a material breach of any of these covenants may result in irreparable and continuing damages to [his employer] for which there may be no adequate remedy at law."[14]  The Agreement was to be effective for four years after it was signed.[15]  After the initial four-year period, the Employment Agreement was subject to extension, which would be considered "employment at will, subject to the terms of [the Employment] Agreement;" however, the contract also provided that "absent mutual written agreement, there is not, nor will there be, any express or implied agreement as to [Kirsch's] continued employment . . . after the Employment Period."[16]  Kirsch signed the Employment Agreement when he began working for S&E on January 20, 2012.[17]  Accordingly, Kirsch's employment contract lasted from January 20, 2012 to January 20, 2016, and thereafter if extended.

---

[12] *Id.* § 5.3(c) (S&E "may, at its sole option, elect not to commence making [severance] payments, in which case [Kirsch] shall have no further obligation under Sections 3.1(b), (c), and (d) following such termination of employment.").

[13] *Id.* § 7.2.

[14] *Id.* § 3.2.

[15] *Id.* § 1.

[16] *Id.* §§ 1, 5.1.

[17] Opening Br. in Support of Def. Mot. for Summ. J., Ex. A, Emp't Agreement.

Kirsch's relationship with S&E was also governed by the OIP Holdings, LLC Phantom Class A Unit Plan Notional Class A Unit Award Agreement (the "Phantom Unit Agreement"). The Phantom Unit Agreement is governed by Delaware law.[18] The parties entered the Agreement on January 20, 2012, when Kirsch joined S&E.[19] Under the Phantom Unit Agreement, Kirsch was awarded 1,000 Class A shares in OIP Holdings, LLC (Badger's predecessor), as part of his employment with S&E.[20]

The relevant provisions in the Phantom Unit Agreement are largely identical to those in the Employment Agreement. The Phantom Unit Agreement contains the same non-competition and non-solicitation provisions: it restricts Kirsch's involvement with companies competitive to OIP Holdings and prohibits Kirsch from soliciting customers of OIP Holdings.[21] Although it does not contain a severance provision identical to that in the Employment Agreement, the Phantom Unit Agreement similarly provides that Kirsch is not obligated to comply with the non-solicitation and non-compete provisions, "following termination of employment, to the extent [Kirsch] is not obligated to comply with the corresponding covenant obligations in the Employment Agreement pursuant to the

---

[18] Hanson Aff., Ex. 5, Phantom Class A Unit Plan § 9.
[19] Hanson Aff., Ex. 1, Kirsch Dep. 20:7–18.
[20] Coen Aff. ¶ 9; Paulsen Aff., Ex. 1.
[21] Hanson Aff., Ex. 5, Phantom Class A Unit Plan § 5(a)(ii), (iv).

7

last sentence of 5.3(c) in the Employment Agreement;" that is, the severance payment provision.[22]  In this way, the severance provision was incorporated into the Phantom Unit Agreement.  The Phantom Unit Agreement also contains the same irreparable harm provision as does the Employment Agreement.[23]

The Phantom Unit Agreement defines OIP Holdings to include any of its "Affiliates or direct or indirect Subsidiaries with whom the Participant has been materially and directly involved."[24]  OIP later became Badger, and S&E is a subsidiary of Badger; thus, the Phantom Unit Agreement governs Kirsch's relationship with S&E and Badger.

While employed with S&E, Kirsch held the title of Sales Manager.[25]  He was responsible for "pricing, securing work for [S&E, and] making sure that the extras were priced right and built right."[26]  Kirsch worked primarily in the five boroughs of New York, and occasionally in New Jersey.[27]

2. Kirsch Joins DHS Fraco

While Kirsch was employed with S&E, he was approached several times with employment offers by Daniel Chirila, who was the owner of Dynamic Hoisting

---

[22] *Id.* § 5(b).
[23] *Id.* § 5(c).
[24] *Id.* § 5(f).
[25] Hanson Aff., Ex. 1, Kirsch Dep. at 16:10–21.
[26] *Id.* at 16:17–21.
[27] Opening Br. in Support of Def. Mot. for Summ. J., Ex. C, Kirsch Dep. at 18:21–19:6.

8

Scaffolding Company, Inc. ("Dynamic").[28]  Dynamic was not considered to be a competitor of S&E at the time, but it intended to expand into the scaffolding and hoist market, which was its reason for offering Kirsch employment.[29]  Although Kirsch met with Chirila approximately every one to two months between January and June 2016, he stated in his deposition testimony that he told Chirila he was happily employed with S&E and did not intend to leave.[30]  Over time, Chirila's offers "became more aggressive."[31]  Eventually, in late-summer 2016, Chirila introduced Kirsch to Armand Rainville, the CEO of Fraco, USA, Inc. ("Fraco"), a wholly-owned subsidiary of Canadian Hoist Company, Inc. ("Fraco Parent").[32]  Thereafter, Kirsch, Chirila, and Rainville met approximately once or twice a month.[33]

At some point during the course of these meetings, Kirsch decided to take Chirila and Rainville up on their employment offer.  Chirila and Rainville had gathered labor and purchased equipment to expand into the scaffolding and hoist market, and Kirsch was needed to "put the puzzle together."[34]  During this period, there were "a lot of changes rapidly."[35]  Ultimately, Dynamic merged with Fraco to

---

[28] Hanson Aff., Ex. 1, Kirsch Dep. at 31:10–11; Hanson Aff., Ex. 15, Chirila Dep. at 15:24–16:1.

[29] Hanson Aff., Ex. 14, Impieri Dep. at 14:11–13; Hanson Aff., Ex. 1, Kirsch Dep. 34:23–36:4.

[30] Hanson Aff., Ex. 1, Kirsch Dep. at 33:21–23, 32:10.

[31] *Id.* at 34:19.

[32] *Id.* at 35:2–8; Hanson Aff., Ex. 6, Limited Liability Company Operating Agreement at 1.

[33] Hanson Aff., Ex. 1, Kirsch Dep. at 35:14–15.

[34] *Id.* at 35:23–36:5.

[35] *Id.* at 38:15–16.

form DHS Fraco, LLC ("DHS Fraco").[36]  Together with Chirila and Rainville, Kirsch would run DHS Fraco, the scaffolding and hoist division of Fraco Parent. Kirsch knew that he was not permitted to compete with S&E, but he did not tell Chirila, Rainville, or anyone associated with DHS Fraco about his S&E non-compete agreement.[37]

The record indicates that Kirsch received a draft of the DHS Fraco Limited Liability Company Operating Agreement (the "DHS Fraco Operating Agreement") in fall 2016—by November 28, 2016 at the latest—while Kirsch was still employed with S&E.[38]  Kirsch, Chirila, and Rainville contemplated that Kirsch would leave S&E to be the "branch manager" of DHS Fraco.[39]  At some point in fall 2016, Kirsch also received a draft employment agreement from Chirila and Rainville.[40]  At that time, he told them, "I can sign a contract but I can't work," because of the non-competition agreement with S&E.[41]  Kirsch negotiated the DHS Fraco Employment Agreement, and signed the Agreement on October 13, 2016.[42]  Kirsch did not receive

---

[36] *Id.* at 38:14–15.
[37] *Id.* at 39:5–6, 36:6–9.
[38] *Id.* at 37:23–25; Hanson Aff., Ex. 11.  The original date on the signed agreement was November 28, 2016; however, the November date was later crossed out and replaced with February 3, 2017, the date Kirsch began working for DHS Fraco.  Hanson Aff., Ex. 11; *see also* Hanson Aff., Ex. 1, Kirsch Dep. at 62:16–19.
[39] Hanson Aff., Ex. 10.
[40] Hanson Aff., Ex. 1, Kirsch Dep. at 41:22–25, 42:18–23.
[41] *Id.* at 42:12–13.
[42] *Id.* at 43:13–15; Hanson Aff., Ex. 8.  This Agreement was with Fraco Products, Inc.  Hanson Aff., Ex. 8.  A later iteration of the Fraco Employment Agreement was between Kirsch and DHS Fraco.  Hanson Aff., Ex. 10.

compensation from DHS Fraco until February 2017, after his employment with S&E ended.[43]

### 3. Kirsch Leaves S&E

On January 3, 2017, Kirsch gave S&E notice of his resignation, effective January 31, 2017.[44] In January 2017, while still working for S&E, Kirsch sent S&E clients emails to inform them that he was moving to DHS Fraco. One such email, sent to Peter Pavlakis of Pav-Lak Contracting, Inc. ("Pav-Lak") on January 25, 2017, read: "U R the best, resigned today, have an ownership agreement again with [a] great company, all new hoists and patent on runways, lower prices, happy days are here again."[45] Pav-Lak ultimately became a customer of DHS Fraco.[46]

Before Kirsch's employment with S&E ended on January 31, 2017, representatives from S&E discussed with him the logistics of his leaving the company.[47] This included ensuring that he returned all company property, that he submitted recent expenses for reimbursement, and that he was compensated for unused vacation time.[48] At no time did anyone indicate to Kirsch that he would receive severance payments from S&E, and Kirsch never, in fact, received

---

[43] Hanson Aff., Ex. 1, Kirsch Dep. at 43:20–23.
[44] Coen Aff. ¶¶ 12–13.
[45] Hanson Aff., Ex. 2.
[46] Hanson Aff., Ex. 3.
[47] Opening Br. in Support of Def. Mot. for Summ. J., Ex. F, Ariza Dep. at 13:6–18:22.
[48] *Id.*

11

severance.[49]    At the time Kirsch's resignation from S&E became effective on January 30, 2017, S&E was unaware of Kirsch's efforts in January 2017 on behalf of DHS Fraco.[50]

On February 3, 2017, Kirsch began employment with DHS Fraco.[51]   DHS Fraco is a competitor of S&E, and it is therefore also a competitor of Badger.[52]  After Kirsch was working for DHS Fraco, he sent emails to approximately five of S&E's clients, stating that he had joined DHS Fraco and that DHS Fraco manufactures and installs various construction equipment and scaffolding.[53] At deposition, Kirsch stated that he did not take any confidential information with him when he left S&E.[54]

*C. Procedural Posture*

The Plaintiffs filed this action on February 24, 2017 and brought three counts.[55]  In Count I, the Plaintiffs seek declaratory judgment regarding Kirsch's obligations under the Phantom Unit Agreement.[56]  Count II alleges that Kirsch breached the Phantom Unit Agreement.[57]   In Count III, the Plaintiffs seek preliminary and permanent injunctive relief.[58]  I denied a Motion to Dismiss on June

---

[49] *Id.* at 32:19–23;
[50] Coen Aff. ¶ 13.
[51] Hanson Aff., Ex. 1, Kirsch Dep. at 62:11–12.
[52] Hanson Aff., Ex. 14, Impieri Dep. at 39:3–6.
[53] Hanson Aff., Ex. 1, Kirsch Dep. at 76:12–14, 77:15–78:3; *see also* Hanson Aff., Ex. 4.
[54] Hanson Aff., Ex. 1, Kirsch Dep. at 90:3–5.
[55] *See* Compl.
[56] *Id*. ¶¶ 33–38.
[57] *Id*. ¶¶ 39–42.
[58] *Id*. ¶¶ 43–50.

29, 2017. On January 12, 2018, the Plaintiffs moved for partial summary judgment on the breach of contract issue and injunctive relief, and Kirsch moved for summary judgment on all counts.[59]

## II. ANALYSIS

Under Court of Chancery Rule 56, summary judgment will be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[60] The moving party bears the initial burden of demonstrating the "absence of a material factual dispute."[61] If the moving party makes this initial showing, "the burden shifts to the nonmovant to present some specific, admissible evidence that there is a genuine issue of fact for a trial."[62] In reviewing a summary judgment motion, the Court "must view the evidence in the light most favorable to the non-moving party."[63] Thus, the Court must deny a request for summary judgment "if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom."[64]

---

[59] *See* Apr. 19, 2018 Oral Arg. Tr. at 26:4–7 (discussing the scope of the Plaintiffs' Motion for Partial Summary Judgment).

[60] Ct. Ch. R. 56(c).

[61] *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 356 (Del. Ch. 2008) (quoting *Levy v. HLI Operating Co.*, 924 A.2d 210, 219 (Del. Ch. 2007)).

[62] *Id.*

[63] *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99 (Del. 1992).

[64] *In re El Paso Pipeline Partners, L.P. Derivative Litig.*, 2014 WL 2768782, at *8 (Del. Ch. June 12, 2014) (quoting *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970)).

Where, as here, the parties have filed cross-motions for summary judgment and have not argued that a material issue of fact exists, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[65] Nevertheless, "even when presented with cross-motions for summary judgment, a court must deny summary judgment if a material factual dispute exists."[66]

The sole issue to be determined here is whether there was a breach of contract and, if so, the appropriate remedy. The Plaintiffs allege that Kirsch breached the covenant not to compete in the Phantom Unit Agreement; accordingly, they contend that they are entitled to injunctive relief and damages.[67] The Plaintiffs have not moved for Summary Judgement on the issue of damages.

To succeed on their breach of contract claim, the Plaintiffs must show that there was a valid contract, breach of an obligation imposed by that contract, and resulting damages.[68] While there is disagreement about the applicability of the Employment Agreement, there is no dispute that the Phantom Unit Agreement applies. I will first discuss why the Employment Agreement governs. The next

---

[65] Ct. Ch. R. 56(h).

[66] *Bank of N.Y. Mellon v. Realogy Corp.*, 979 A.2d 1113, 1119 (Del. Ch. 2008).

[67] Compl. ¶ 42. I note that although the Plaintiffs broadly assert that Kirsch has used S&E's confidential information—which, if true, would violate Section 3.1(a) of the Employment Agreement—they failed to explain how or when that breach occurred. Accordingly, I consider here only the covenants not to compete.

[68] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

question is whether there was a breach of the relevant contracts. To answer that question, I look to the terms of the contracts.[69]

*A. The Employment Agreement Applies*

The terms of the Employment Agreement between Kirsch and S&H provided that the Agreement would be effective for four years after it was signed. Kirsch signed the Employment Agreement on January 20, 2012; accordingly, it was in place until January 20, 2016, after Kirsch's original four-year employment term was fulfilled. The actions at issue here did not occur until later in 2016. Nevertheless, the Employment Agreement states that after the initial four-year period, the contract is subject to extension, which will be considered "employment at will, subject to the terms of the [Employment] Agreement."[70]

The Plaintiffs posit that the Employment Agreement does not apply because the initial four-year term had expired and the contract was never extended in writing.[71] The Employment Agreement provides that "[a]bsent mutual written agreement" there shall be no "express or implied agreement as to [Kirsch's]

---

[69] *See Ostroff v. Quality Serv. Labs, Inc.*, 2007 WL 121404, at *11 (Del. Ch. Jan. 5, 2007) ("A contract's express terms provide the starting point in approaching a contract dispute.").

[70] Opening Br. in Support of Def. Mot. for Summ. J., Ex. A, Emp't Agreement §§ 1, 5.1.

[71] Apr. 19, 2018 Oral Arg. Tr. at 20:20–22:1. This, they submit, means that only the Phantom Unit Agreement applies. *Id.* at 22:2–4. Furthermore, the Plaintiffs assert that because there was no extension of the Employment Agreement, Kirsch was not entitled to receive severance, and so he was not entitled to compete on the basis of not receiving severance. Pls. Supplemental Mem. at 5. For reasons discussed in this Opinion, I disagree with both of these contentions.

15

continued employment."[72]  The contract goes on to state that Kirsch's employment during "any extended Employment Period will be employment at will, subject to the terms of this Agreement."

There is no doubt that Kirsch remained an employee after the initial term of his Employment Agreement expired.  Kirsch seamlessly continued his employment with S&E after the four years had passed.  He showed up to work every day; he continued to perform the same job functions in the same position as Director of Sales; between January and June 2016, he informed Chirila that he was happily employed with S&E; he gave S&E proper notice of his resignation in January 31, 2017.  On the Plaintiffs' part, the record indicates that S&E kept Kirsch in his position as its Director of Sales and accepted the benefits of his continued employment.  It continued to pay Kirsch his salary and to provide other benefits as set by the terms of the Employment Agreement, notably without S&E exercising its discretion to impose terms for Kirsch's "compensation or benefits . . . subject to agreement by" Kirsch, as provided in the contract after the termination of the "initial or extended Employment Period."

In other words, at the termination of the initial four-year period, the Employment Agreement contemplated a written extension or a renegotiation. Neither occurred.  Under what terms, then, was Kirsch employed?  Despite the fact

---

[72] Opening Br. in Support of Def. Mot. for Summ. J., Ex. A, Emp't Agreement § 5.1.

that the parties operated as though the Employment Agreement was still in place, the Plaintiffs argue that its provisions were void at the end of the initial period, and that, although Kirsch continued to perform his obligations, S&E was excused from theirs, including the severance obligation. The Plaintiffs, therefore, do not rely on the non-compete and non-solicitation provisions of the Employment Agreement; they seek instead to impose the identical provision under the Phantom Agreement, which is not subject to the four-year term.

Kirsch, by contrast, argues that the Plaintiffs, having continued to accept the benefits of his continued performance of the Employment Agreement, are estopped from denying their concomitant obligations thereunder. This argument appears persuasive. I need not reach it, however, because the Phantom Unit Agreement, on which the Plaintiffs purport to solely rely, in any event picks up the terms of the Employment Agreement. Section 5(a) of the Phantom Agreement contains the non-compete and solicitation covenants. Section 5(b) conditions the obligations of those covenants: "Notwithstanding anything to the contrary set forth in this Agreement, [Kirsch] shall not be obligated to comply with the covenant obligations . . .following termination of employment, to the extent [Kirsch] is not obligated to comply with the corresponding covenant obligation in the

17

Employment Agreement . . ." under Section 5.3(c), the severance election provision.[73]

Reading these contracts together to the extent called for by their terms, and in light of the conduct of the parties, it is clear that after the end of the initial period of the Employment Agreement, the parties continued to be bound by both the non-compete and non-solicitation provisions of the Agreements, as well as the severance provisions referred to in both of the Agreements.

*B. Did Kirsch Breach the Employment Agreement?*

1. <u>While Employed With S&E</u>

The Employment Agreement contains a non-compete provision, which prohibits Kirsch from "performing advisory or consulting services for, invest[ing] in, . . . or otherwise operat[ing] or becom[ing] associated in any capacity (including as an employee)" with any company that competes with S&E during his employment with S&E.[74]  During his employment, Kirsch was also prohibited from contacting, soliciting, or enticing S&E customers in a manner that would cause the customer to reduce or cease business with S&E.[75]

To my mind, Kirsch's actions while employed with S&E fail to comply with these restrictions.  It is true that Kirsch's meeting with Chirila and Rainville,

---

[73] *Id.* § 5.3(c).
[74] *Id.* § 3.1(b).
[75] *Id.* § 3.1(d).

without more, is insufficient to constitute breach of the Employment Agreement's non-compete obligations. However, Kirsch breached his obligations when he became associated with DHS Fraco in November 2016. The record demonstrates that at that time, Kirsch, Chirila, and Rainville decided to form DHS Fraco, an entity that would compete with S&E. Moreover, Kirsch decided to leave S&E for DHS Fraco. These decisions are evidenced by the DHS Fraco Employment Agreement that Kirsch signed on October 13, 2016—at which time Kirsch was still an S&E employee, and would continue to be for more than two months.

Additionally, Kirsch breached the Employment Agreement's obligations when he contacted S&E customers in January 2017. Kirsch emailed Pav-Lak on January 26, 2017. Although by that time he had given his notice of resignation to S&E, he was still an employee of S&E. The communication was outside the scope of his employment with S&E; in fact, it touted DHS Fraco's lower prices. Pav-Lak ultimately moved its business from S&E to DHS Fraco. This is precisely the situation that Section 3.1(d) of the Employment Agreement was designed to prevent. Thus, for these reasons, I find that Kirsch breached the obligations imposed by the Employment Agreement during his employment with S&E.

### 2. After Leaving S&E

The same non-compete provisions that applied during Kirsch's employment with S&E also applied for two years after his employment; however, Kirsch

19

specifically negotiated a severance provision, which was included in the Employment Agreement at Section 5(c). As a result of that negotiated provision, the contractual non-compete would apply after Kirsch's employment with S&E had concluded *only if* S&E elected to pay him severance.

On January 3, 2017, Kirsch gave S&E representatives notice of his resignation. S&E does not contest that Kirsch gave proper notice. At that point, under both the Employment and Phantom Unit Agreements, S&E was faced with a choice. It could buy-in Kirsch's obligations not to compete, by paying severance, or it could forgo both severance and the corresponding non-compete. Kirsch had negotiated for precisely this scenario. Section 5(3)(c) of the Employment Agreement, as incorporated into the Phantom Agreement, provides that where Kirsch terminates his employment after two years of service, he shall continue to receive his salary for one year in way of severance payments:

> For the avoidance of doubt, it is acknowledged and agreed that the severance payments under this Section 5.3(c) are additional consideration given in exchange for [Kirsch's] compliance with the [covenant not to compete] after termination of employment . . . and, notwithstanding anything to the contrary in this Agreement, the Company may, at its sole option, elect not to commence making such payments, in which case [Kirsch] shall have no further obligation [not to compete] following such termination of employment.[76]

---

[76] *Id.* § 5.3(c).

When Kirsch left for DHS Fraco, S&E elected[77] to avoid severance and forgo the post-employment non-compete.

S&E never indicated to Kirsch that he would receive severance, and it never paid Kirsch severance. Although I have found that Kirsch had breached his contractual obligations prior to his leaving S&E, S&E had no knowledge of Kirsch's breach when it elected not to pay him severance. The severance payment is consideration to extend the non-compete provision *after* the end of Kirsch's employment with S&E. Under the clear language of the Agreements, S&E's failure to pay severance must be considered a release from the contracts' restrictive covenants post-employment. Kirsch is not liable for breaching his contractual obligations after he left S&E, because S&E released him from any such obligations.

The Plaintiffs also allege that Kirsch has retained the Plaintiffs' confidential information, which if true, would be a violation of Section 3.1(a) of the Employment Agreement.[78] The Plaintiffs have not identified any of Kirsch's actions that utilize confidential information. Instead, they argue that the very act of soliciting and negotiating with S&E customers on DHS Fraco's behalf *must* utilize

---

[77] This election is triggered regardless of whether it resulted from a conscious decision or by oversight. S&E would contractually trigger the non-compete by "commencing" severance payments, which it never did. *See id.*
[78] Compl. ¶ 37.

21

the Plaintiffs' confidential information, but they point to no record evidence to support that Kirsch actually used the Plaintiffs' confidential information.[79] Merely soliciting and negotiating with S&E's customers, without more, is not a *per se* use of S&E's confidential information. If it were, I note, the severance and non-competition election, discussed at length above, would be largely illusory. For these reasons, based on the evidence of record, I cannot find that the Plaintiffs have met their burden to demonstrate that Kirsch used their confidential information. Accordingly, Kirsch's Motion for Summary Judgment as it pertains to his post-employment conduct is granted.

*C. Did Kirsch Fulfill His Obligations Under the Phantom Unit Agreement?*

In addition to the Employment Agreement, Kirsch's relationship with S&E was also governed by the Phantom Unit Agreement. The Phantom Unit Agreement was executed on January 20, 2012, when Kirsch joined S&E. The Phantom Unit Agreement contains the same non-compete provision as does the Employment Agreement: it prohibits Kirsch from "performing advisory or consulting services for, invest[ing] in, . . . or otherwise operat[ing] or becom[ing] associated in any capacity (including as an employee)" during his employment with S&E or for two years thereafter.[80] Likewise, it contains the same non-

---

[79] *See* Pls. Answering Br. in Opp'n to Def.'s Mot. for Summ. J. at 27.
[80] Hanson Aff. Ex. 5, Phantom Class A Unit Plan § 5(a)(ii).

solicitation provision as the Employment Agreement, which prohibits Kirsch from contacting, soliciting, or enticing S&E customers in a manner that would cause the customer to reduce or cease business with S&E.[81] The Phantom Unit Agreement also incorporates the Employment Agreement's severance provision; S&E could either pay Kirsch severance or he would be entitled to compete.

Because the non-competition, non-solicitation, and severance provisions were essentially the same in the Phantom Unit Agreement as in the Employment Agreement, my reasoning from above applies to the Phantom Unit Agreement as well.[82] To the extent that Kirsch engaged in competitive behavior by joining DHS Fraco while employed with S&E, Kirsch breached the obligations of the Phantom Unit Agreement. Furthermore, Kirsch breached the obligations of the Agreement when he solicited at least one S&E client, Pav-Lak, for DHS Fraco's benefit while employed with S&E. Nonetheless, S&E elected not to pay Kirsch severance. Thus, the obligations of the Phantom Unit Agreement did not continue after Kirsch left S&E.

---

[81] *Id.* § 5(a)(iv).

[82] The Plaintiffs argue that because the Employment Agreement is not applicable, neither is the severance payment under the Phantom Unit Agreement. *See* Apr. 19, 2018 Oral Arg. Tr. at 22:19–23:14. For reasons I have already discussed, I reject that argument.

*D. Remedy*

### 1. Injunctive Relief

The Plaintiffs seek an injunction to prevent Kirsch from working for DHS Fraco.[83] To succeed, they must show: (1) actual success on the merits; (2) irreparable harm; and (3) that the balance of hardships favors the Plaintiffs.[84]

The Plaintiffs have shown that Kirsch breached the non-compete covenants of the Employment and Phantom Agreements during, but not following, his employment. Because the non-compete obligation terminated with S&E's decision not to pay severance, no injunction is warranted.[85]

### 2. Damages

The Plaintiffs are entitled to damages, if any, for the breaches of the non-compete covenants prior to January 31, 2018. The record is bare of any evidence of damages.[86] To the extent that damages exist, my findings require that those damages be limited to Kirsch's breach of contract during his employment at S&E, since his contractual obligations terminated when he was not paid severance after he left S&E on January 30, 2017.

---

[83] Compl. ¶ 46.
[84] *N. River Ins. Co. v. Mine Safety Appliances Co.*, 105 A.3d 369, 380 (Del. 2014).
[85] As discussed earlier, I have granted Kirsch's Motion for Summary Judgment regarding the allegation that Kirsch violated his contractual confidentiality obligations. It follows logically that to the extent the Plaintiffs seek an injunction to prevent Kirsch from using their confidential information, that injunction must be denied.
[86] At oral argument, the Plaintiffs clarified that they had moved for Summary Judgment on the breach of contract claim and injunctive relief, but that they would like a separate hearing on damages. Apr. 19, 2018 Oral Arg. Tr. at 26:4–7.

The parties should confer and inform me whether further proceedings are necessary regarding damages.

## III. CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment is granted in part and denied in part, and the Defendant's Motion for Summary Judgment is granted in part and denied in part. The parties should submit an appropriate form of order.