Barbara L. VANAMAN, an Infant, by her next friend, Nancy M. Vanaman, Walter Lee Vanaman and Nancy M. Vanaman, Plaintiffs Below, Appellants,

v.

MILFORD MEMORIAL HOSPITAL, INC., a Delaware corporation, Defendant Below, Appellee,

and

C. Edward Graybeal, Defendant Below.

Supreme Court of Delaware.

Dec. 21, 1970.

Houston Wilson, Georgetown, and Courtney H. Cummings, Jr., of Killoran & Van Brunt, Wilmington, for plaintiffs below, appellants.

Victor F. Battaglia, of Biggs & Battaglia, Wilmington, for Milford Memorial Hospital, Inc., defendant below, appellee.

WOLCOTT, C. J., DUFFY, Chancellor, and SHORT, Vice Chancellor, sitting.

DUFFY, Chancellor:

This appeal brings up for review an order of the Superior Court granting a summary judgment to the defendant hospital in a malpractice suit. Del.Super., 262 A.2d 263 (1970).

### A.

Barbara L. Vanaman, plaintiff, (and her parents) seek damages for injuries which she allegedly sustained as a result of the negligence of Milford Memorial Hospital, Inc., (Hospital) and Dr. C. Edward Graybeal, defendants, Miss Vanaman at age 16 fell and twisted her ankle. When her family physician could not be reached, she was taken to the Hospital about two hours after the fall. Dr. Graybeal, a staff member then on duty, ordered X-rays; a fracture was identified and the doctor put a cast on her left leg.

The complaint alleges that the cast was too tight, that it resulted in injuries to plaintiff, and that there was a failure to diagnose and treat the resulting physical condition. As a consequence thereof, it is alleged, Miss Vanaman suffered injuries to the vascular, lymph, cellular and/or nervous system, tissues and cells of her leg. Plaintiff contends that the Hospital is responsible for Dr. Graybeal's alleged negligence. The Hospital argues that Dr. Graybeal was not its servant, agent or employee.[1]

---

1. Dr. Graybeal and the Hospital Administrator each filed an affidavit denying that the doctor acted as an agent, servant or employee of the Hospital in treating Miss Vanaman.

Since liability of the Hospital is based entirely on what Dr. Graybeal did, the appeal raises a single question: If malpractice is proved, may the Hospital be held responsible for it? The Court below held as a matter of law that the Hospital could not be. In our view the answer to that question depends on findings of fact which cannot be made on the present record.

### B.

The law applicable in malpractice claims asserted against a hospital has its uncertainties, but in two fact situations it is clear:

The first is this: a sick or injured person consults his own doctor for diagnosis and treatment; the doctor recommends hospital care; thereafter the doctor treats him in the hospital; the patient pays all expenses, including fees directly to the doctor. In this situation the law commonly regards the doctor as an independent contractor in his relationship to the hospital and to the patient. The hospital is not liable for malpractice by the doctor.

The second, at the other end of the spectrum, is this: a sick or injured person is taken directly to a hospital; his problem is diagnosed and he is there treated by a doctor employed by the hospital (as an intern, resident, or in some other capacity). The hospital is liable for malpractice by that doctor under the doctrine of *respondeat superior*.

See Annotation: 69 A.L.R.2d 309.

The Court below examined the practice at the Hospital under which a paying patient applying for admission without a doctor of his own was assigned to a member of the active medical staff on service in rotation. Relying on Johnson v. City Hos-

pital Co., 196 N.C. 610, 146 S.E. 573 (1929), and Smith v. Duke University, 219 N.C. 628, 14 S.E.2d 643 (1941), the Court concluded that the Hospital was merely providing a referral service in introducing Dr. Graybeal to Miss Vanaman and, in so doing, did not make him its servant nor did it incur any liability for his conduct. Neither *Johnson* nor *Smith* arose in an emergency context, and in neither case did the Court find evidentiary facts from which a holding-out-as-agent could be determined.

### C.

■ It is elementary, of course, that a summary judgment may be granted only if, on undisputed facts, the moving party establishes that he is entitled to that judgment as a matter of law. Any application for such a judgment must be denied if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom.

■ As the opinion below demonstrates, there are facts in the record from which it may be found that the Hospital did no more than refer plaintiff to Dr. Graybeal.[2] If that be so found, then the doctor was an independent contractor in his relationship to the patient and the Hospital is not liable for malpractice, if any, on his part. Smith v. Duke University, supra; 69 A.L.R.2d 309. We think, however, that there is a conflict of fact as to whether plaintiff was simply referred to Dr. Graybeal under Rule 3, or whether she was treated by him as a doctor staffing the Hospital's emergency facility. The latter hypothesis is supported by the following contentions and evidence in the record.

Plaintiff's claim is made in an "emergency" context.[3] The Hospital main-

2. Rule 3 of the Hospital's Rules and Regulations states:

"In the case of a pay patient applying for admission who has no attending physician, he shall be assigned to the members of the active staff on service in rotation."

3. In Wilmington General Hospital v. Manlove, 54 Del. 15, 174 A.2d 135 (1961) we held that liability on the part of a

tained an emergency facility; that facility was offered to the public and the public was directed to it.[4]

Miss Vanaman went to the Hospital for emergency assistance; she expected such service and she implicitly asked for it. When she arrived (according to answers to interrogatories verified by plaintiffs) plaintiffs advised the receptionist that they wished to have the physician or surgeon then on duty care for such injuries as she may have sustained when she fell. Plaintiffs were told that Dr. Graybeal was the surgeon on duty at the Emergency Room and he would attend her as soon as he was free. She was sent for X-rays and then returned to the Emergency Room, in a wheel chair, by a Hospital attendant. Dr. Graybeal, who was in attendance upon another emergency patient in an adjoining Emergency Room, came to Miss Vanaman, made his examination and diagnosis, and then treated her by applying the short leg cast to her left lower extremity from toes to knee; he instructed plaintiffs to return the following day to the Emergency Room of the Hospital where he would check the cast. That was done.[5]

hospital may be predicated on the refusal of service to a patient in case of an unmistakable emergency, if the patient relied upon a well-established custom of the hospital to render aid in such case.

4. On deposition the Hospital's Administrator (at the time) testified:
"Q The Milford Memorial Hospital did run and operate an emergency unit?
A That is correct.
\*　　\*　　\*　　\*　　\*
Q When would a patient come to the emergency unit of the hospital rather than come to the general admissions facility of the hospital?
A Well, in a case of any emergency situation where they had a cut or wound of some type or another, and virtually any other type. You might get a patient at two o'clock in the morning who had a cold who would walk into the emergency room.
Q And these emergency facilities were open to the members of the general public?
A Yes.
Q And they were maintained and operated as such, is this correct?
A This is correct.
\*　　\*　　\*　　\*　　\*
Q Well, did the hospital maintain signs and directions which directed members of the general public to the emergency unit as distinct from the general admission unit to the hospital?
A Yes."

5. On deposition Nancy K. Vanaman testified:
"A \* \* \* I called our family doctor \* \* \* and he wasn't in. We waited a few minutes. She was to call back—his receptionist, that is—but in the meantime I called back again and she said he couldn't be located, and she advised that we take Barbara to the hospital and have it X-rayed because that is what he would normally do anyway.
We took her up, and my husband went in to get a wheelchair to take her into the emergency room. When he came with the wheelchair there was a resident physician, or an intern or attendant, with him. They helped her into the wheelchair and we went in. He asked me at the time if I had any doctor that I would like called.
Q Who is 'he'?
A The attendant, the resident doctor that was wheeling the wheelchair in. I told him no, that any doctor on duty would do, because I really didn't know any doctor up there, not to call on especially.
\*　　\*　　\*　　\*　　\*
Q You last left us by saying that when you were asked if you had any particular doctor that you wanted, that you had told them no, any doctor that was on duty. Now pick it up from there.
A Yes. Well, the attendant said that would be Dr. Graybeal, that he was in one of the emergency rooms attending to a little boy who had had an accident of some sort. I believe he had broken an arm or something. Dr. Graybeal came out and he introduced himself and he said that he was Dr. Graybeal, and he asked us what happened. Then he ordered the X-ray.
She went up and had it X-rayed, and they came down. Then he came on in and put the cast on. He said it was broken and it had to have a cast on it."

At the time plaintiff went to the Hospital it employed on its payroll at least one and perhaps three house physicians. But a doctor employed by the Hospital was not on duty on the day when plaintiff appeared. If he had been on duty there, under the established Hospital policy, she would have been referred to him, But under the Hospital's rules and regulations (in effect at the time) Dr. Graybeal was assigned to take the calls which that doctor otherwise would have taken.[6]

It seems to us that these facts present a jury question as to the capacity in which Dr. Graybeal responded to the call: Was he merely the doctor to whom Miss Vanaman was referred in his "private" capacity? Or was he manning the emergency room of the Hospital during the absence of the resident physician who normally would have been there and did he attend plaintiff while performing that function for the Hospital?[7]

Dr. Graybeal was not paid by the Hospital, nor was he subject to its control in the way in which he performed his medical and surgical services. He was paid by plaintiff (or her insurance carrier). This may have some relevancy on the crucial question but it is not determinative. We say this because if it should be found that the Hospital represented that Dr. Graybeal was its servant or other agent in diagnosing and treating plaintiff in its emergency facility, and if it thereby caused her to justifiably rely upon the care or skill of Dr. Graybeal, then it is liable to her for harm caused by any lack of care or skill by Dr.

Graybeal just as if he were the Hospital's servant or agent. Restatement, Agency, Second, § 267.

The judgment of the Superior Court is reversed.

6. In answer to an interrogatory the Hospital said:
"On June 27, 1964 [the day plaintiff appeared at the Hospital], Dr. C. Edward Graybeal was taking resident call in the emergency room and in charge of admission, diagnosis and treatment of patients in the emergency room."
And, in answer to another question, it said:
"On the day in question, the resident physician was off duty and staff physi-

cians were assigned to take resident call by Chief of Staff."

7. There is nothing in the record to show that the Hospital's emergency facility was closed because its resident physician was off duty. On the contrary, the Hospital's own procedure required that a staff doctor substitute ("take-call") for the resident.